**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* REID LAWSON | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. CV 210-072 |
| | ) | |
| v. | ) | |
| | ) | |
| BEVERLY ENTERPRISES, INC.; | ) | **JURY TRIAL DEMANDED** |
| BEVERLY HEALTH AND REHABILITATION | ) | |
| SERVICES, INC.; BEVERLY ENTERPRISES | ) | |
| GEORGIA, INC.; BEVERLY HEALTH & | ) | |
| REHAB CENTER-JESUP (d/b/a/ GOLDEN | ) | |
| LIVING CENTER-JESUP); GOLDEN GATE | ) | |
| NATIONAL SENIOR CARE HOLDINGS, LLC; | ) | |
| GOLDEN GATE ANCILLARY, LLC; and | ) | |
| AEGIS THERAPIES, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## THE UNITED STATES' COMPLAINT

Plaintiff, the United States of America, by and through its undersigned counsel, brings this action against the Defendants for submitting and causing the submission of false claims to the Medicare program.  For its causes of action, the United States alleges as follows:

## I.   NATURE OF THE ACTION

1.   This is an action brought by the United States to recover damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C § 3729 *et seq.* and to recover all available damages and other monetary relief under the common law and other equitable causes of action for unjust enrichment and payment by mistake.  Each of these causes of action arise from a scheme by the Defendants to knowingly submit and cause the submission of false claims for payment to the Medicare program for services that were not covered by

the skilled nursing benefit, that were not medically reasonable and necessary, and that were not skilled. The Defendants also submitted and caused to be submitted false records to get such claims paid.

## II.   **JURISDICTION**

2.    This action arises under the FCA and under the common law.

3.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1345 because the United States is the plaintiff. In addition, the Court has subject matter jurisdiction over the FCA causes of action under 28 U.S.C. § 1331 and supplemental jurisdiction to entertain the common law and equitable causes of action under 28 U.S.C. § 1367(a).

## III.   **VENUE**

4.    Venue is proper in the Southern District of Georgia under 28 U.S.C. §§ 1391(b) and (c) under 31 U.S.C. § 3732(a) because Defendants qualify to do business in the State of Georgia, transact substantial business in this District, and can be found within this District.

## IV.   **PARTIES**

5.    Plaintiff is the United States of America (hereinafter, the "United States" or the "Government"). The United States brings this action on behalf of the United States Department of Health and Human Services ("HHS"), including its sub-agency, the Centers for Medicare and Medicaid Services ("CMS"), which administers the Medicare program.

6.    Defendant Beverly Enterprises, Inc., Defendant Beverly Health and Rehabilitation

Services, Inc., and its affiliate Defendant Beverly Enterprises Georgia, Inc. (collectively, "Beverly") are headquartered in Fort Smith, Arkansas.  Beverly owns and operates skilled nursing facilities nationwide, including Defendant "Beverly Health & Rehab Center – Jesup" located in Jesup, Georgia which also does business as "Golden Living Centers – Jesup."  The National Provider Identified (NPI) for Beverly Health & Rehab Center – Jesup is 1588610935.

7.     Defendant Golden Gate National Senior Care Holdings, LLC and its affiliate, Defendant Golden Gate Ancillary, LLC are headquartered in Fort Smith, Arkansas and are part of the self-described "Golden Living family of companies" that are ultimately owned by Fillmore Strategic Investors, LLC, and Fillmore Capital Partners, LLC.

8.     Defendant Aegis Therapies, Inc. ("Aegis") is one of the Golden Living family of companies and headquartered in Plano, Texas.  Aegis is one of the largest contract rehabilitation therapy companies in the United States, providing rehabilitative services at more than 1,100 facility locations, in 39 states, including Georgia.

9.     Relator Reid Lawson is a resident of Jesup, Georgia.  Mr. Lawson has been licensed physical therapist for approximately 22 years.  In 2009, Mr. Lawson was hired by Defendant Aegis as a physical therapist.  During the relevant time period, Lawson provided physical therapy services to residents at Beverly Health & Rehab Center – Jesup and at facilities where Aegis provides contract rehabilitation therapies.  Mr. Lawson commenced this *qui tam* action against Aegis on or about April 29, 2010.

## V.     THE FALSE CLAIMS ACT

10.   The FCA provides, in pertinent part, that any person who:

3

   (A)  knowingly presents, or causes to be presented, a false or fraudulent claim for

       payment or approval; [or]

   (B)  knowingly makes, uses, or causes to be made or used, a false record or statement

       material to a false or fraudulent claim . . .

****

is liable to the United States Government for  a civil penalty of not less than [$5,500]

and not more than [$11,000] per violation, plus three times the amount of damages

which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1)-(2) (2006), as amended by 31 U.S.C § 3729(a)(1)(A)-(B) (2010).

11.   The FCA further provides that "knowing" and "knowingly" -

   (A) mean that a person, with respect to information -

        (i)  has actual knowledge of the information;

        (ii)  acts in deliberate ignorance of the truth or falsity of the

            information; or

        (iii)  acts in reckless disregard of the truth or falsity of the information;

            and

   (B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b) (2006), as amended by 31 U.S.C. § 3729(b)(1) (2010).

## VI.   THE MEDICARE PROGRAM

### A. Medicare Coverage Of Skilled Nursing Facility Rehabilitation Therapy

12.   Congress established the Medicare Program in 1965 to provide health insurance

coverage for people age 65 or older and for people with certain disabilities or afflictions.

*See* 42 U.S.C. §§ 426, 426A.

13.   The Medicare program is divided into four "parts" that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

14.   Subject to certain conditions, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period *(i.e.,* spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. §409.61(b) and (c).

15.   The conditions that Medicare imposes on its Part A skilled nursing facility ("SNF") benefit include: (1) that the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) that the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) that the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R.§ 409.31(b).

16.   Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the nursing facility and to re-certify the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter. *See* 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

17.   To be considered a *skilled* service, it must be "so inherently complex that it can be

safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists. *See* 42 C.F.R.§ 409.31(a).

18.   Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitious exercises (e.g., exercises to improve gait, maintain strength or endurance, or assistive walking). *See* 42 C.F.R. § 409.33(d). "Many skilled nursing facility inpatients do not require skilled physical therapy services but do require services, which are routine in nature. Those services can be performed by supportive personnel; e.g., aides or nursing personnel . . . . " Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1.

19.   Medicare Part A will only cover those services that are reasonable and necessary. *See* 42 U.S.C. § 1395y(a)(l)(A); *see also* 42 U.S. C. § 1320c-5(a)(l) (providers must assure that they provide services economically and only when, and to the extent, medically necessary); 42 U.S.C. § 1320c-5(a)(2) (services provided must be of a quality which meets professionally recognized standards of health care).

20.   In the context of skilled rehabilitation therapy, this means that the services furnished must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; must be consistent with accepted standards of medical practice; and must be reasonable in terms of duration and quantity. *See* Medicare Benefit Policy Manual, Ch. 8, § 30.

21.   In order to assess the reasonableness and necessity of those services and whether

reimbursement is appropriate, Medicare requires proper and complete documentation of

the services rendered to beneficiaries. In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other
> person under this part unless there has been furnished such
> information as may be necessary in order to determine the amounts
> due such provider or other person under this part for the period with
> respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l(e).

## B. Medicare Payment For Skilled Nursing Facility Rehabilitation Therapy

22.   Under its prospective payment system ("PPS"), Medicare pays a nursing facility a

pre-determined daily rate for each day of skilled nursing and rehabilitation services it

provides to a patient.  *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

23.   The daily PPS rate that Medicare pays a nursing facility depends, in part, on the

Resource Utilization Group (RUG) to which a patient is assigned.  Each distinct RUG is

intended to reflect the anticipated costs associated with providing nursing and

rehabilitation services to beneficiaries with similar characteristics or resource needs.

From January 1, 2006, to October 1, 2010, there were 53 RUGs in the so called "RUG-

III" classification system.  *See* 70 Fed. Reg. 45,026, 45,031 (Aug. 4, 2005).

24.   There are generally five rehabilitation RUG levels for those beneficiaries who

require rehabilitation therapy: Rehab Ultra High (known as "RU"), Rehab Very High

("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

25.   The rehabilitation RUG level to which a patient is assigned depends upon the

number of skilled therapy minutes a patient received and the number of therapy

disciplines the patient received during a seven-day assessment period (known as the

"look back period").  The chart below reflects the requirements for the five rehabilitation

RUG levels under the RUG-III classification system.

| Rehabilitation RUG Level | Requirements to Attain RUG Level |
|---|---|
| RU = Ultra High | Minimum 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week |
| RV = Very High | Minimum 500 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |
| RH = High | Minimum 325 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |
| RM = Medium | Minimum 150 minutes per week total therapy; one therapy discipline must be provided at least 5 days a week |
| RL = Low | Minimum 45 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |

Source: 63 Fed. Reg. at 26,262.

26.   Medicare pays the most for those beneficiaries that fall into the Ultra High RUG

level.  The Ultra High ("RU") RUG level is "intended to apply only to the most complex

cases requiring rehabilitative therapy well above the average amount of service time."  63

Fed. Reg. 26,252 and 26,258 (May 12, 1998).

27.   In addition to reflecting a patient's rehabilitation therapy needs, each RUG also

reflects an assessment the patient's ability to perform certain activities of daily living

("ADL"), like eating, toileting, bed mobility and transfers (e.g., from a bed to a chair).  A

patient's ADL score (ranging from A to C) reflects his or her dependency level when

performing an ADL.  A very dependent patient, who cannot perform any of the ADLs

without assistance, would generally receive an ADL score of "C," while a patient who

could perform the ADLs without assistance would receive an ADL score of "A."

28.   In addition to the ADL scores of A, B, and C, Medicare provides "X" and "L" ADL

scores for those beneficiaries that require "extensive services" in addition to

rehabilitation therapy.  Extensive services include intravenous treatment, ventilator or

tracheostomy care, or suctioning.  A very dependent rehabilitation patient who requires more extensive services would generally receive an ADL score of "X," while a patient who needs only one of the services might receive an ADL score of "L."

29.  CMS has made certain modifications to the RUG-III structure through its RUG-IV classification system, which became effective October 1, 2010.  CMS added new clinical RUG categories, modified the timeframe in which each assessment must be performed, required that nursing facilities assess changes in the level of therapy every seven days, and revised certain rules pertaining to group therapy, among other changes.  74 Fed. Reg. 40,288 (Aug. 11, 2009).

**C.  Skilled Nursing Facility Rehabilitation After Hospitalization**

30.  Due to a patient's condition, inpatient hospitalization may be required from time to time.  In order to qualify for post-hospital extended care services (such as physical or occupational and/or speech-language pathology services), the individual must have been an inpatient of a hospital for a medically necessary stay of at least three consecutive calendar days.  Medicare Benefit Policy Manual, Chapter 8, § 20.  In determining whether the requirement has been met, the day of admission, **but not the day of discharge**, is counted as a hospital inpatient day.  *Id.* at § 20.1 (emphasis in original).

**D.  Statements And Claims To Medicare For Payment of Skilled Nursing Facility Rehabilitation Therapy**

31.  Medicare requires skilled nursing facilities to assess periodically each patient's clinical condition, functional status, and expected and actual use of services, and to report the results of those assessments using a standardized tool known as the Minimum Data Set ("MDS").  The MDS is used as the basis for determining a patient's RUG level and,

therefore, the daily rate that Medicare will pay a nursing facility to provide skilled nursing and therapy to that patient.

32.   In general, a nursing facility must assess each patient and complete the MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's Medicare Part A stay in the facility.  The date the facility performs the assessment is known as the assessment reference date.  A nursing facility may perform the assessment within a window of time before this date, or, under certain circumstances, up to five days after.  When a nursing facility performs its assessment (except for the first assessment), it looks at the patient for the seven days preceding the assessment reference date.  As discussed above, this seven day assessment period is referred to as the "look-back period."

33.   The MDS collects clinical information on over a dozen criteria, including hearing, speech, and vision; cognitive patterns; health conditions; and nutritional and dental status. Section P of the MDS ("Special Treatments and Procedures") collects information on how much and what kind of skilled rehabilitation therapy the facility provided to a patient during the lookback period. In particular, Section P shows how many days and minutes of therapy a nursing facility provided to a patient in each therapy discipline (i.e., physical therapy, occupational therapy, and speech-language pathology and audiology services). As discussed below, the information contained in Section P directly impacts the rehabilitation RUG level to which a patient will be assigned.

34.   In most instances, the RUG level determines Medicare payment prospectively for a defined period of time.  *See* 63 Fed. Reg. at 26,267.  For example, if a patient is assessed on day 14 of his stay, and received 720 minutes of therapy during days 7 through 14 of

the stay, then the facility will be paid for the patient at the Ultra High RUG level for days 15 through 30 of the patient's stay.

35.   Prior to October 1, 2010, the nursing facility would electronically transmit the MDS form to a state's health department or other appropriate agency, which in turn would transmit the data to CMS.  42 C.F.R. § 483.20(f)(3) (2008); 42 C.F.R. § 483.315(h)(l)(v) (2008).  Since October 1, 2010, nursing facilities transmit the data directly to CMS.  42 C.F.R. § 483.20(f)(3).

36.   Completion of the MDS is a prerequisite to payment under Medicare.  *See* 63 Fed. Reg. at 26,265.  The MDS itself requires a certification by the provider that states, in part: "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds."  Minimum Data Set (MDS) - Version 2.0 for Nursing Home Resident Assessment and Care Screening.

37.   A patient's RUG information is incorporated into the Health Insurance Prospective Payment System ("HIPPS") code, which Medicare uses to determine the payment amount owed to the nursing facility.  The HIPPS code contains five digits, the first three represent the RUG Code, and the last two represent a numerical value of the ADL assessment.  The HIPPS code must be included on the CMS-1450, which nursing facilities submit electronically to Medicare for payment.  Medicare Claims Processing Manual, Ch. 25, § 75.5.  Medicare payment will depend largely on the HIPPS code the nursing facility submitted as part of the CMS-1450.  *See* 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, Ch. 25, § 75.5.

11

38.   Skilled nursing facilities submit the CMS-1450 electronically under Medicare Part A to Medicare payment processors, known as Medicare Administrative Contractors ("MACs"), formerly known as Fiscal Intermediaries ("FIs").   MACs process and pay Medicare claims.

39.   Since August 2008, Palmetto GBA, LLC ("Palmetto") has served as the Part A MAC for Defendant Beverly Health & Rehab Center -- Jesup.   Palmetto is headquartered in South Carolina, but they maintain offices in several other states.   Prior to August 2009, United Government Services, a subsidiary of Blue Cross Blue Shield United of Wisconsin, served as the Part A MAC for that facility.

## VII.   DEFENDANTS SUBMITTED OR CAUSED THE SUBMISSION OF CLAIMS FOR SERVICES THAT WERE MEDICALLY UNREASONABLE, UNNECESSARY, AND UNSKILLED

40.   In order to meet aggressive and unrealistic Ultra High and average length of stay targets, Aegis therapists frequently recorded and provided services that were medically unreasonable, unnecessary, and unskilled.   Instead of developing plans of care that were tailored to a patient's clinical characteristics and actual needs, Aegis therapists would subject patients to therapy that had little clinical benefit and served only to inflate the number of minutes the facility could report on the Minimum Data Set and bill Medicare.

41.   For example, on May 6, 2010, Defendant Aegis provided training to its employees and therapists about the importance of medical record documentation.   In the training material, Aegis told therapists that medical record "documentation is more of an art than a science."   It was the therapist's responsibility to provide "clear and convincing" documentation in order to "sell the [therapist's] reviewer" that "this patient's condition is so complex that it will only improve through the skilled intervention of a therapist."

According to Aegis training, the "ultimate goal" of medical record documentation should be "reimbursement."

42.   As a result of Aegis' constant emphasis for billable minutes, its therapists regularly recorded and provided services that were medically unreasonable, unnecessary, and unskilled.  As illustrated by the examples below, Aegis therapists subjected Medicare patients to Ultra High levels of therapy when their clinical characteristics and physical condition indicated that they could not be reasonably expected to participate in, much less benefit from, those levels of intensive therapy.

A. **Defendants Recorded, Provided, and Billed Medicare For Therapy That Was Excessive In Frequency, Duration, and Intensity and Potentially Harmful To Patients**

43.   Aegis therapists recorded, provided, and billed Medicare for therapy that was excessive in frequency, duration, or intensity for patients who could not be reasonably expected to benefit from skilled therapy and/or who showed no significant progress from the therapy.

44.   When Aegis therapists would meet with nursing staff and others to develop a patient plan of care, it was assumed and Aegis therapists were told that the patient should be "skilled" [i.e., be subjected to physical, occupational, and speech therapy services] for the full 100 days of covered benefits, regardless of the patient's condition, any goals for therapeutic services, or the patient's progress.

45.   Aegis supervisors emphasized to therapists the importance of ensuring that patients were described as having complex conditions to justify more therapies.  During documentation training, therapists were told, "the more complex your patient looks, the

more therapy services you will be able to provide (i.e., more minutes per day, more days
per week, and more weeks altogether)."

46.   For example, Patient B.C. had multiple admissions and re-admissions to Beverly
Health & Rehab Center – Jesup from May 2010 to September 2010.  Patient B.C. was a
84-year old individual admitted to the hospital on April 28, 2010, for worsening heart
failure, diabetes, hypertension, renal failure, shortness of breath, wheezing, and edema.
Patient B.C. had other earlier hospitalizations for generally the same conditions.  Patient
B.C. was admitted to the skilled nursing facility on May 8, 2010.  Despite Patient B.C.'s
frail status at the time of admission, the patient received 65 minutes of physical therapy,
82 minutes of occupational therapy, and 80 minutes of speech therapy on the second day
of admission.  The patient received ultra-high (RU) therapy (720 minutes) with all three
disciplines on both the 5-day and 14-day payment periods.  On June 2, 2010, Patient B.C.
returned to the hospital with renal failure, pneumonitis, MRSA in sputum; yet a therapist
recorded 50 minutes of physical therapy and 50 minutes of occupational therapy on the
day of transfer to the hospital.  Patient B.C. was readmitted to the facility on June 11,
2010, with a central IV line.  On the day of readmission, a therapist recorded 75 minutes
of speech therapy.  On July 14, 2010, Patient B.C. was transferred back to the hospital for
dehydration, slurred speech, and mental status change.  That same day, a therapist
recorded 35 minutes of speech therapy.  When the patient was readmitted to the facility,
the patient again received all three therapy disciplines at very high levels.  Finally, after
another hospitalization, Patient B.C. was re-admitted to the facility on August 25, 2010,
and received 57 minutes of physical therapy, 65 minutes of occupational therapy, and 82
minutes of speech therapy, one day after being re-admitted.

14

47. For example, Patient N.B. was admitted to Beverly Health & Rehab Center – Jesup on September 25, 2008. Patient N.B. was admitted to the hospital for a fractured right femur and fractured pelvis, with other conditions of dementia, arthritis, and malaise. Aegis therapists set unrealistic long-term goals for the patient considering the individual's condition. Further, Patient N.B. had documented episodes of confusion and noncompliance with the therapy. Nevertheless, the patient received all three therapies at ultra high levels for the 5-day, 14-day, 30-day, and 60-day assessment/payment periods, and at very high levels for the 90-day assessment period.

48. Aegis therapists provided, and Defendants billed for, ultra high levels of therapy without regard to improvement or need, even up to the time of patient's death.

49. For example, Patient L.T. was a resident of Beverly Health & Rehab Center – Jesup who received ultra high levels of therapy during the 5-day, 14-day, 30-day, and 60-day assessment payment periods. For the 90-day assessment period, Patient L.T. received very high therapy services. Patient L.T. was then admitted to the hospital on August 8, 2008, and expired three days later.

## B. Aegis Therapists Used Suspect Diagnoses To Justify Unnecessary Speech Therapy

50. Speech-Language Pathology or "Speech Therapy" is a covered skilled rehabilitation service provided directly to patients. *See* Medicare Benefit Policy Manual, Chapter 8, § 30.4 and § 30.4.2; (cross-reference to the Medicare Benefit Policy Manual, Chapter 1, § 110.2).

51. In order for speech therapy to be considered reasonable and necessary, the documentation in the patient's medical record must show that the patient will be reasonably expected to actively participate in and benefit significantly as a result of the

speech therapy. *Id.* The patient can only be expected to benefit significantly from the therapy if the patient's condition and functional status are such that the patient can reasonably be expected to make measurable improvement and that such improvement can be expected to be made within a prescribed period of time. *Id.*

52. Aegis therapists regularly used the treatment diagnosis of "symbolic dysfunction" as a means to document the need for and continued provision of speech therapy for patients who did not need such therapy and were unlikely to benefit from such therapy.

53. The medical records would not support a treatment diagnosis for symbolic dysfunction, nor the need for speech therapy. Often, speech therapy minutes would be recorded in the medical record by the therapist, but there would not be accompanying speech therapy notes or documentation to support the therapy.

54. According to the American Speech-Language Hearing Association, "symbolic dysfunction" is a language/cognitive impairment of an organic nature and is usually associated with a neurological condition (such as Parkinson's disease or Cerebral Vascular Accident/Stroke). The lack of a neurological condition in a patient may indicate a lack of medical necessity for treatment of symbolic dysfunction.

55. In addition, including speech therapy as part of multiple therapy disciplines may also increase the overall therapy utilization for a patient to the maximum level of 720 minutes, resulting in an ultra high RUG reimbursement rate for that payment period.

56. For example, Patient J.B. was admitted to Beverly Health & Rehab Center – Jesup on October 28, 2009. The patient's speech therapy medical diagnosis was pneumonia and speech therapy treatment diagnosis was symbolic dysfunction and dysphagia. The medical record indicated that the patient suffered from, among other things, severe

16

fatigue and weakness, and likely could not tolerate or benefit from lengthy speech

therapy sessions.  Nevertheless, Patient J.B. received ultra high speech therapy at 720

minutes per week for the entire time period of the 5-day, 14-day, and 30-day assessment

periods.  The speech therapy notes do not indicate any significant improvement arising

from such high levels of speech therapy.

57.   For example, Patient M.J. was admitted on June 25, 2010, with diagnosis of

pneumonia and general weakness, and a speech therapy treatment diagnosis of symbolic

dysfunction.  Speech therapy was provided at ultra high levels.  However, the symbolic

dysfunction is not supported in the patient's medical record which also indicated that the

patient did not improve significantly considering the length and duration of such therapy.

## C. Aegis Therapists Provided Medically Unnecessary and Unskilled Group Therapy

58.   On information and belief, Defendant Beverly Health & Rehab Center – Jesup

improperly placed patients into group therapy that was not related to their plans of care or

that included activities in which patients could not be reasonably expected to participate,

as a way to inflate their therapy minutes.

59.   Group therapy is where a single therapist conducts the same therapy exercises with 2

to 4 patients at the same time.  For example, if a therapist provided 60 minutes of the

same therapy to three patients at the same time, then the therapist could include the full

60 minutes of time when determining each patient's RUG level.

60.   On information and belief, Aegis therapists would regularly have between 6 to 15

patients gather in the designated gym area at Beverly Health & Rehab Center – Jesup and

have each of the patients utilize a stationary bicycle.  While a physical therapist would

organize such therapy, oftentimes, patients were left unattended or unsupervised, without

any effort to monitor the patient or to ensure the patient actually performed the activity. The physical therapist would later record minutes for this activity as skilled therapy, regardless of outcome, performance, or medical benefit.

61.   Relator Lawson personally witnessed group therapy sessions that would involve 6 to 15 patients ambulating, with or without assistance, the perimeter of the gym-area or the cafeteria in 20-minute increments.  No individualized care or actual therapy was provided to patients during the "walk-a-thons."  Such activity usually occurred on Fridays each week at Beverly Health & Rehab Center - Jesup.  A physical therapist would later record minutes for this activity as skilled therapy, regardless of outcome, performance, or medical benefit.

**D.  Defendants' Use of Unnecessary and Unreasonable PENS Modality**

62.   "Modalities" generally describe treatments such as heat, cold, and electrical stimulation that are used to produce a tissue response to help reduce pain and inflammation, or to strengthen, relax, or heal muscles.  Modalities do not ordinarily require the skills of a qualified therapist unless there is a particular patient complication (e.g., an open wound or fracture).  Medicare Benefit Policy Manual 100-2, Chapter 8, § 30.4.1.2.

63.   On information and belief, Aegis therapists were pushed to utilize and bill for Patterned Electrical Neuromuscular Stimulation (PENS) as a form of rehabilitation therapy.

64.   PENS is a form of electrical stimulation whereby pads are placed on the skin of a

patient and the PENS machine runs an electrical current to the affected area.   Due to the

risks of an electrical current on the patient (e.g., pain, burning), a patient should be able

to communicate effectively with the therapist throughout the therapy.

65.   On information and belief, Aegis supervisors pressured therapists to provide PENS

therapy without regard to medical necessity or patient improvement, and sometimes, at

the risk to the patient.   For example, while at Beverly Health & Rehab Center – Jesup,

Relator Lawson once personally witnessed a comatose patient receive PENS therapy.

Relator Lawson also personally witnessed on numerous occasions, patients, who were

confused or had difficulty communicating, receive PENS therapy.

66.   On information and belief, Aegis sets goals for therapists to utilize PENS therapy on

Medicare Part A patients without taking into account individual patient needs.   Aegis

therapists who recorded a high level of minutes of PENS therapy were recognized and

commended by supervisors.   Relator Lawson often questioned and complained to his

supervisors about the use and necessity for such high minutes of PENS therapy.

## VIII.   EXAMPLES OF FALSE CLAIMS

67.   Attached to and made part of this Complaint is Exhibit 1 which contains information

identifying some of the false claims submitted or caused to be submitted by the

Defendants for the Medicare patients discussed in section VIII of this Complaint.   The

claims identified in Exhibit 1 are false because they were submitted to Medicare for

payment for therapy services that were unreasonable, unnecessary, and/or unskilled in

nature.

68.   In addition, the claims identified in Exhibit 1 are false because they derive from

false entries and statements contained in the MDS and other patient records which purport to justify the minutes of skilled and medically necessary therapy provided to Medicare patients. The entries and statements are false because the minutes listed include therapy that was medically unreasonable, unnecessary, and/or unskilled.

## IX.  DEFENDANTS KNEW THAT THEY WERE BILLING FOR MEDICALLY UNREASONABLE, UNNECESSARY AND UNSKILLED SERVICES

69.  Defendants knew Medicare only paid for skilled rehabilitative therapy services that were reasonable and necessary, consistent with the nature and severity of the patient's illness or injury, the patient's particular medical needs, and accepted standards of medical practices.

70.  Defendants also knew, since at least September 2008, that the provision of medically unnecessary rehabilitation services was an area of concern identified by the HHS, Office of Inspector General ("HHS-OIG").

71.  In September 2008, the HHS-OIG published supplemental guidance to skilled nursing facilities that identified therapy services and in particular the "improper utilization of therapy services to inflate the severity of RUG classifications and obtain additional reimbursement" as a fraud and abuse risk area. HHS-OIG Supplemental Compliance Program Guidance for Nursing Homes, 73 Fed. Reg. 56,832 and 56,840 (Sept. 30, 2008).

72.  As the HHS-OIG further noted, "Unnecessary therapy services may place frail but otherwise functioning residents at risk for physical injury, such as muscle fatigue and broken bones, and may obscure a resident's true condition, leading to inadequate care plans and inaccurate RUG classifications." *Id.*

73.  The HHS-OIG "strongly advise[d] nursing facilities to develop policies, procedures

and measures to ensure that residents are receiving medically appropriate therapy services." *Id.*

74. The Defendants' corporate compliance manual contains a "False Claims Act Policy" that states the "company takes health care fraud and abuse very seriously." According to the corporate policy, "prevention of fraud, waste and abuse as well as prevention of a false claim is the responsibility of all employees, contractors, vendors, and agents of the company."

75. With respect to the Defendants' employees, contractors, and agents, the "False Claims Act Policy" states that:

> [E]ach employee, contractor, vendor, and/or agent acting on behalf of the company or doing business with the company must strictly adhere to all policies, procedures, and processes that prevent and/or detect fraud, waste, and abuse, or that assure that all claims submitted are accurate. All entities are responsible for having an understanding of, and following the provision of the Federal [False Claims Act] and the State [False Claims Act] for the state in which they provide service.

## COUNT ONE: FALSE OR FRAUDULENT CLAIMS
### 31 U.S.C. § 3729(a)(1)(A)

76. The United States repeats and re-alleges paragraphs 1-75, as if fully set forth herein.

77. The Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), specifically, claims for payment to Medicare for medically unreasonable, unnecessary, or unskilled rehabilitation therapy.

78. Because of the Defendants' acts, the United States sustained damages in an amount

to be determined at trial, and therefore is entitled to treble damages under the False

Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each

violation.

**COUNT TWO: FALSE STATEMENTS**
**31 U.S.C. § 3729(a)(1)(B)**

79.   The United States repeats and re-alleges paragraphs 1-78, as if fully set forth herein.

80.   The Defendants knowingly made, used, or caused to be made or used a false record

or statement material to a false or fraudulent claim, in violation of the False Claims Act,

31 U.S.C § 3729(a)(1)(B), including false Minimum Data Sets and false entries in the

medical record.

81.   Because of the Defendants' acts, the United States sustained damages in an amount

to be determined at trial, and therefore is entitled to treble damages under the False

Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each

violation.

**COUNT THREE: UNJUST ENRICHMENT**

82.   The United States repeats and re-alleges paragraphs 1-81, as if fully set forth herein.

83.   By virtue of submitting claims to Medicare for unreasonable, medically

unnecessary, or unskilled services, the Defendants obtained inflated payments from the

United States.  Thus, the Defendants were unjustly enriched at the expense of the United

States, in such amounts, as determined at trial.

**COUNT FOUR: PAYMENT BY MISTAKE**

84.   The United States repeats and re-alleges paragraphs 1-83, as if fully set forth herein.

85.   The Defendants submitted claims for Ultra High rehabilitation therapy to Medicare

when that level of care was not medically necessary. The United States paid more money to the Defendants than it would have had the Defendants not submitted claims for unreasonable and medically unnecessary rehabilitation therapy.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States demands and prays that judgment be entered in its favor against the Defendants as follows:

I.   On the First and Second Counts under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

II.  On the Third Count for unjust enrichment, for the damages sustained and/or amounts by which the Defendants were unjustly enriched or which the Defendants retained monies to which they were not entitled, plus interest, costs, and expenses.

III. On the Fourth Count for payment by mistake, for the amounts by which the Defendants obtained to which they were not entitled, plus interest, costs, and expenses.

IV.  All other relief as may be required or authorized by law and in the interests of justice.

[signature page to follow]

Respectfully submitted,

EDWARD J. TARVER
United States Attorney


Edgar D. Bueno
Assistant United States Attorney
Virginia Bar No. 41307
United States Attorney's Office
Southern District of Georgia
P.O. Box 8970
Savannah, Georgia 31412
Telephone: (912) 652-4422
edgar.bueno@usdoj.gov


Scott R. Grubman
Assistant United States Attorney
Georgia Bar No. 317011
United States Attorney's Office
Southern District of Georgia
P.O. Box 8970
Savannah, Georgia 31412
Telephone: (912) 652-4422
scott.grubman@usdoj.gov


Dated:  March 11, 2013